MATTHEW KING v. THE STATE.

No. 5460. Decided December 10, 1919.

**1.—Conspiracy to Murder—Statutes Construed—Threat—Agreement.**

By article 1436, Branch Ann. P. C., it is provided that a threat by two or more persons acting in concert will not be sufficient to constitute conspiracy, and by article 1434 *supra*, the offense is complete, although the parties conspiring do not proceed to effect the object for which they have unlawfully combined. To constitute the substantive offense

of conspiracy there must be a positive agreement to commit a felony and where in the instant case the State charged that the felony was murder it must prove its allegation in order to sustain a conviction, and where the evidence did not show such positive agreement to commit murder the conviction to kill cannot be sustained.

### 2.—Same—Charge of Court—Venue—Statutes Construed—Self-defense.

Under article 253, C. C. P., the offense of conspiracy may be prosecuted in the county where the conspiracy was entered into, or in the county where the same was agreed to be executed, and where the court's charge was upon the weight of the testimony as to the question of venue and the right of self-defense, and in violation of the article of procedure supra, the same was reversible error.

Appeal from the District Court of Knox. Tried below before the Hon. J. H. Milam, judge.

Appeal from a conviction of conspiracy to commit murder; penalty, six years imprisonment in the penitentiary.

The opinion states the case.

*Bert King, Stinson, Chambers & Brooks,* for appellant:—On question of courts charge on venue: Smith v. State, 52 Texas Crim. Rep., 27, 105 S. W. Rep., 182; Faulkner v. State, 62 id., 1093.

*Alvin M. Owsley,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was indicted in Baylor county under a charge of conspiracy, in that he confederated, agreed and conspired with Beulah Owens and Gregg Breeland to kill and husband, G. L. Owens, and appellant in which Owens had fired venue to Knox County.

The evidence discloses that G. L. Owens was the husband of Beulah Owens, and that Gregg Breeland was a brother of Mrs. Owens. It is further disclosed that the parties had known each other practically all their lives, and that Mrs. Owens had become infatuated with appellant, and that their relations had taken on a phase of criminal intimacy. There had been trouble between the husband, G. L. Owens, and appellant in which Owens had fired several shots at appellant on one occasion, and that they had had a difficulty in Mart, McLennan County. There was considerable evidence with reference to this difficulty *pro* and *con* as to who was the aggressor. It is not shown or claimed that the other parties had any connection with the trouble in Mart between appellant and Owens, or that they had any knowledge of it until some time after the difficulty. There was also a shooting scrape in the town of Seymour in January, 1919, between Mrs. Owens and her brother, Gregg Breeland, on one side, and her husband, G. L. Owens, on the other. All three of the parties were pretty badly shot, two of them seriously. Mrs. Owens and Breeland were indicted for assault to murder upon

G. L. Owens. The case was transferred to Cottle County where, upon their trials, a verdict of acquittal was rendered. Appellant was not connected personally with the difficulty between Mrs. Owens and Breeland, on one side, and her husbad, G. L. Owens, on the other. to show by circumstances that he was placed in the relation of accomplice to that difficulty, though not present and participating. The evidence is very weak and inconclusive upon appellant's connection with it. There is no contention that he engaged in the shooting. Prior to this last difficulty G. L. Owens had sued his wife for a divorce, asking custody of the children. This divorce suit was pending in the District Court in Baylor County, and the Parties had assembled at Seymour, the county seat, to try the case on Monday following the above shooting which occurred on Saturday. A divorce was granted, the children awarded to the husband, and Mrs. Owens then married appellant. Subsequent to her marriage and prior to appellant's trial she died. The alleged conspiracy is shown to have occurred in Cooke County. The evidence of this is found in the testimony of Lloyd Owens, a son of G. L. and Beulah Owens. He was a boy something like eleven or twelve years of age. These parties, appellant, Mrs. Owens, Gregg Breeland and Mrs. Owens' children, had gone from Baylor County to Cooke County and adjoining counties for the purpose of picking cotton. This seems to have been about November, 1917. Upon one occasion during this trip he says they were occupying a room in which there were two or three beds. Gregg Breeland and appellant slept in one bed and his mother in another, and the children in another. That one evening, while they were occupying this room or house, they were all in the room, and he says the children were playing, himself being one of them. Quoting now his testimony with reference to the conspiracy, he said:

"While we were living in that house I heard a conversation between my mother, Gregg Breeland and Matthew King about my father; when I heard it me and my sisters and brother were playing up in that end of the house, and they were down at this end talking. All three of them were sitting on the bed. Mamma just said they would get him out of the way, and Matthew said he would help. Gregg was talking with them and they had a right smart of a conversation there, talked about how they would get him out of the way. We picked cotton down there about two weeks, then came back to Baylor County in the wagon. My mamma, Gregg and little sisters and brother came back with me. Matthew King did not come back. He did not come back because papa came to Seymour after his mules; they got a letter from Seymour. I heard them reading the letter and talking about it; then defendant went on back to the little house, got his clothes, and mamma went down there and came back with him; they he went to town; he left about 3 o'clock that evening after they got the letter."

On cross-examination he said: "We stayed there about a week and that is when I heard the conversation, all of them doing the talking. I was not doing any of it. The house wasn't very big. Two beds were in one end of the house and one at the other end. Matthew and Gregg slept in the bed at the other end. I think they were sitting on the beds, and we were playing on the bed Matthew slept on at the time of this conversation, my little sisters and brother playing on the bed with me. I didn't play with them all the time. I heard my mother say something about fixing somebody I heard her say, Matthew, we will get him out of our way." Matthew says, 'I will help you.' I testified at Seymour last July; in th trial I said that Mathew did say something. I did not say on t trial that my mother said she would fix him or get him out of way and that Mathew said nothing and Gregg said nothing. my testimony now, that Mathew King said he would help he him out of the way. . . . When she said 'We will get hir of the way,' Mathew King said he would help her; she sa' would get my papa out of the way, because I knew what s' talking about; she just said, 'We will get him out of the way.      That is all I have to say about it."

The defendant introduced evidence to the effect that such conversation did not occur. Gregg Breeland so testified as did the defendant, Mrs. Owens, subsequently Mrs. King, had died, and was not a witness.

The case seems to present itself this way: that Matthew King and Mrs. Owens were infatuated with each other, even to the extent of criminal intimacy; that Owens, the husband of Mrs. Owens, was very much disturbed about it, to the extent of shooting at appellant on two occasions, and engaging in a serious shooting affair with his brother-in-law, Gregg Breeland, and his wife, in which he wounded them seriously. He also, previous to the last difficulty, had killed one of his wife's brothers and a Mr. Palmer. This also grew out of troubles with and about his wife.

One of the questions presented is, taking the State's case in its strongest light as made by Lloyd Owens, the twelve year old boy, do the facts present a case of a positive agreement, as required by the statute, to commit the crime of murder? And it may be stated that if the conspiracy was to kill, it would be included within the conspiracy to commit murder. See Branch's Ann. P. C., Arts. 1433, 1434, 1435, and 1439. It is also provided by Article 1436, Branch's Ann. P. C., that "a threat made by two or more persons acting in concert will not be sufficient to constitute conspiracy." It is also provided by Article 1434, *supra*, that the offense of conspiracy is complete, although the parties conspiring do not proceed to effect the object for which they have so unlawfully combined. To constitute the substantive and independent offense of conspiracy under the Penal Code, there must be a positive agreement, and this to commit

a felony, and in this case the State charged that felony to be murder. The State, therefore, must prove its allegations in order to obtain a conviction. The offense being complete at the time of entering into the contract or conspiracy, it would be an independent offense for which the parties could be prosecuted and punished. It was not necessary to consummate the offense about which the conspiracy was formed. It was sufficient to constitute the offense that the positive agreement to kill was formed and agreed upon. If this is not shown by evidence, then a conspiracy was not shown, and the allegations were not proved or sustained. Taking the language of the witness Lloyd Owens in its most favorable light to the State, it showed an express desire on the part of his mother to get his father out of the way, in which appellant agreed to assist her. It may be fairly deduced from the testimony that it was the purpose of Mrs. Owens and appellant to assume the marital relations as soon as Owens, the husband, was no longer an impediment. We think this may be fairly deduced from the facts. The further idea may be also indulged that whether this was true or not, that there was more or less danger from the husband of trouble between himself and defendant and the wife while the marital relation existed. The husband had already killed two men, and had shot at the defendant four or five times on one occasion. It may be as fairly deduced from this testimony that murder was not contemplated as that it was. The language used by the boy, placed in the mouth of his mother, that they would get him out of the way, does not show a positive agreement to kill. If his testimony be true, it does show that it was the purpose of his mother to get rid of his father. He was an impediment to her amours and her infatuation with appellant. We are of opinion, taking the testimony in its strongest light for the State, that it does not show a positive agreement, as required by the statute, to commit the offense of murder. The statute provides that a threat to kill, if this testimony be given that construction, is not sufficient to justify a conspiracy.

Perhaps we might rest the case here for reversal. Bills of exception were reserved to various rulings of the court, among others, to the instructions given the jury. On the question of venue, which is seriously attacked by appellant, the court gave the following instruction to the jury:

"If a conspiracy to murder is entered into in Baylor County, or if a conspiracy to murder is entered into in any county in this State, and that the agreement was to be carried out and executed in Baylor County, or if a conspiracy to murder is entered into in any county in this State, and that one or of the conspirators made an assault in Baylor County upon the person that they had conspired to murder, with the purpose and intent of then and there carrying out and executing said conspiracy but failed in their purpose, Baylor County would have jurisdiction of the offense."

The statute, Article 253, C. C. P., reads as follows: "The offense of conspiracy may be prosecuted in the county where the conspiracy was entered into or in the county where the same was agreed to be executed," etc.   The remainder of the article refers to conspiracy entered into in another state or territory.   Inasmuch as the State relied upon the testimony of Lloyd Owens to show the conspiracy in all its forms and phases as a basis, we would necessarily look to this testimony with reference to the question not only of conspiracy but venue.   If his testimony is to be credited, the agreement entered into by the parties already discussed was had in Cooke County.   Where it was to be executed is not shown or stated.   We are of opinion that the court's charge was upon the weight of the testimony, and in violation of the article of the procedure, *supra*.   There must be some evidence that the conspiracy was to be executed in Baylor County, for this is required by the statute.   This charge is also erroneous from another view point.   The jury was instructed that if one or more of the conspirators made an assault in Baylor County upon the person that they had conspired to murder, with the pupose of carrying out their previously formed design, this would confer jurisdiction upon Baylor County.   This and the subsequent portions of the charge failed to instruct the jury that if the difficulty which occurred between Mrs. Owens and her brother on one side and her husband on the other was not an assault made by them, but made by him and they were acting in self-defense, that this would not be in furtherance of the common design, nor in execution of their conspiracy, if one existed.   Breeland and Mrs. Owens had been tried and acquitted on the theory of self-defense in regard to the difficulty above mentioned.   All the details of the difficulty were before the jury as well as the fact they had been tried and acquitted.   The court in his charge throughout submits the case to the jury as to venue and as to defendant's responsibility upon the theory that Mrs. Owens and Gregg Breeland were in the wrong, and committed an assault, and this being true, or at least from that standpoint, this would make them responsible for the conspiracy and lodge venue in Baylor County.   The law of conspiracy to kill would not deprive the parties of the right of self-defense.   If it be conceded that their purpose was to kill the husband Owens, and they had made an attack upon him for that purpose, then the State must show in some way by proper and legal evidence that it was in furtherance of their conspiracy and with a view of executing it.   This, as a basis by the court, would assume, first, that a conspiracy was established, and, second, that Breeland and Mrs. Owens were the aggressive parties upon the husband in the difficulty, and for the purpose of executing the previously formed conspiracy.   If, however, as shown by the opposing facts as well as the acquittal of both by the verdict of the jury, they were acting in self-defense, then the court having submitted the State's theory, should have submitted the opposing theory.   Even had

a conspiracy been formed as contended by the State through the testimony of the witness Lloyd Owens, yet if they did not execute it, or attempt so to do, this would not be evidence to bolster up the State's case on conspiracy, nor would it deprive the alleged conspirators of the right of self-defense if they were attacked by Owens. If he brought on the difficulty and was the aggressor, his wife and her brother had the right to defend their lives. Whether they had previously entered into a conspiracy or not, the mere fact that they may have entered into a conspiracy under such circumstances would not debar them the right of self-defense, if they were not undertaking to carry out their conspiracy and the object of the conspiracy, and brought on the difficulty with a view of killing him. Under the charge of the court this theory of the cases was not submitted, nor was the defendant's legal right in any way guarded by the charge. The court assumed that Gregg Breeland and Mrs. Owens were the aggressors in this difficulty, and for the purpose of executing their designs under the supposed conspiracy, and also as a basis for venue in Baylor County of the offense of conspiracy which is shown to have been entered into, if at all, in Cooke County.

There are twenty bills of exception incorporated in the record as well as exceptions to the court's charge. It is not thought necessary to review these *seriatim* but to treat the case in a general way as we have done.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*