## SIESS WESTBROOK V. STATE

No. 30,966. January 20, 1960
Motion for Rehearing Overruled March 30, 1960

DAVIDSON, Judge, dissented.

*Frank Mabry, Frederick W. Robinson, W. E. Martin* (on appeal only) Houston, for appellant.

*Dan Walton,* District Attorney, *Samuel H. Robertson, Jr., Jon N. Hughes,* Assistants District Attorney, Houston, and *Leon Douglas,* State's Attorney, Austin, for the state.

MORRISON, Presiding Judge.

The offense is the substantive crime of conspiracy to commit the offense of murder; the punishment, seven years.

The indictment charged appellant with conspiring with

Maudell Berger to kill Walter Berger, whom the record shows was her husband. This case presents an extremely bizarre fact situation. The state adduced the following evidence from their principal witness, Walter Sands. That he was doing undercover work on narcotics cases for the police of Alexandria, Louisiana, when he came in contact with the appellant on January first of last year and that the appellant offered him $500 to help pull a "fool-proof job" of killing a man in Texas. On that first meeting the appellant refused to divulge the name of the intended victim, but the parties made arrangements to meet the following morning. At this meeting Sands asked appellant if his proposition was a joke and the appellant replied in the negative, stated that it was "an insurance job" and again refused to give the victim's name, saying that if Sands did not agree to help that he intended to go through with the matter by himself. Immediately following this, Sands approached the sheriff's office through the basement, in order not to be seen, and there reported his two conversations with the appellant to Deputy Cappell and told him that he was still not sure that appellant was in earnest. In the afternoon of that same day, Sands returned to the sheriff's office in the same manner and had a conference with Captain Oliver of the Texas Rangers, Ranger Rogers and Galveston Police Chief Henson, at which time Sands asked the Texas officers if he would be afforded protection if he agreed to "go along" with the appellant's scheme and was assured that someone would be behind him at all times. Sands and the appellant left Louisiana early the next morning in Sand's automobile, the description of which he had given the officers, and officers were in fact waiting for them as they entered Galveston County. During the entire time the parties were in Galveston County the officers kept them under surveillance. Before arriving in Galveston the appellant told Sands that the intended victim was one Walter Berger and described how he planned to kill him so as to make it appear that Berger had died in an automobile wreck. The plan was to keep Berger alive until immediately before a simulated automobile wreck could be effected so that any autopsy which might be held would not disclose a discrepancy in the time of death. The two men stopped at a cafe in Galveston and while they were having coffee Sands excused himself saying that he was going to the restroom but instead found a telephone, called the number which Chief Henson had given him and being unable to speak to the chief, sent him a message that he had learned the intended victim was Walter Berger of Angleton. During their stay in Galveston Sands, at appellant's instruction, purchased a pair of handcuffs

to be used in restraining Berger while he was being held prisoner. Following this the parties went to Texas City and then returned to Galveston and thence to Angleton, where they drove by a house which the appellant said belonged to Berger but the Bergers were not at home. They then went to a shack in the woods near Brazoria where appellant planned to hold Berger a prisoner until a propitious time for the murder arrived. After another attempt to locate the Bergers, appellant and Sands went to La Porte where they visited with Sands's cousin, Malone, and while there Sands called his cousin's wife aside and told her that he was working "with the law," gave her the full details of appellant's plan, and instructed her to call Chief Henson and report to him that Berger had not yet been located. The two then returned to Angleton where they spent the night. The following morning when they returned to the Berger house they discovered the Bergers in the act of moving their furniture. Appellant left Sands near the home to keep watch while he returned to their hotel to get their clothes. While the appellant was away a police car came by, Sands hailed them and notified them of his reason for being there, requested that they call Chief Henson and inform him that the Bergers were moving, that he and appellant would follow them and that he would try to contact the chief again. As the Bergers left, appellant and Sands pursued them at a discreet distance and Sands observed that his automobile was being followed. While making this trip appellant told Sands that the plans had been changed and that he would tell Sands something but that if he ever repeated it he would kill him. He then said that Mrs. Maudell Berger was "in on the job" and Sands said that he did not trust her and demanded that he have a chance to talk to her before going further with the plan and the appellant said "I will see what I can do."

The Berger automobile came to a halt in Pasadena, Sands stopped some distance away, and the automobile which had been following them stopped still further down the street. When the appellant left to get some sandwiches, Sands who had remained at the scene spoke to the officers who were in the automobile which had followed him and told them that because of the Bergers' move he did not know what appellant would do. At hourly intervals during the next day appellant and Sands drove by the Bergers' new home in Pasadena but Berger's automobile was not there and on each trip Sands observed Chief Henson's automobile near the scene. That night Sands absented himself from the appellant, called the police and told them to relieve their surveillance until the next morning. The two men

in question spent the night in a Houston hotel, during which time Sands got away from appellant and called Captain Walters of the Harris County Sheriff's Office and reported to him that he and appellant had a date to meet Mrs. Berger at the Champion Paper Mill the following morning. In the morning the two proceeded to the mill where they talked to Mrs. Berger about the money to pay Sands for his participation in the murder. Soon thereafter Sands left appellant at a drug store with instructions from appellant that he should go to the Berger home, get Berger and, under the guise of being an officer, forcibly take him to Malone's home, which was a new place of confinement upon which they had agreed. Instead of doing as instructed, Sands went to Berger, told him of the plan to take his life, the officers were called, they arrived in a very few minutes, and the appellant was arrested at the drug store.

On the issue of whether or not Sands was a party to the crime of conspiracy, the court admitted and so instructed the jury in his charge, the following testimony:

Officer Russell of the Galveston police testified that he waited at Bolivar Ferry until the appellant and Sands came across and kept them under surveillance during their stay in the county.

Chief Henson testified that he went to Alexandria, Louisiana, with Captain Oliver and Ranger Rogers and there talked with Sands and Deputy Sheriff Cappell at which time Sands reported to them the murder plot, that he gave Sands both his telephone numbers, that he heard from Sands the next day and saw Sands in Pasadena the following Monday in company with appellant as they were parked and appeared to be watching a house across the street. He stated that thereafter and prior to appellant's arrest he saw Sands and appellant together as many as ten times.

Captain Oliver testified about the trip to Louisiana and Sands' report of the murder plot, that Sands wanted to know if he should continue with his part in the matter and that because the officers did not then know the name of the intended victim in Texas, he asked Sands "to continue with his part in the plot and keep us advised" and promised him police protection after he got to Texas. He stated that there was no mention of compensating Sands at that time. He said that he saw Sands and appellant in Pasadena on the following Sunday near the Berger residence and that after appellant left the

scene Sands reported to him that he and appellant planned to "take" Berger the following morning, that he saw Sands and appellant together near the Berger home several times and finally he went to the Berger home in response to a message, there found Sands and Walter Berger together, that Sands told him appellant was waiting at the store and that he proceeded to the store where he arrested appellant.

Mrs. Malone, a relative of Sands, testified that Sands came to her house in company with appellant, that she and Sands talked privately at which time Sands told her he was working with "the law," explained the murder plot and instructed her to call Chief Henson. She stated that later she agreed with Sands that he might tell appellant that they could use her home as a place of confinement for Berger prior to the time they would kill him since the Brazoria County shack was no longer feasible.

Deputy Sheriff Elder of Brazoria County testified that he trailed appellant and Sands, who were themselves following the Berger automobile from Angleton to Pasadena, and after their arrival talked to Sands, Captain Oliver and Chief Henson, and kept Berger and his home under surveillance until shortly before appellant's arrest.

Captain Walters of the Harris County Sheriff's Office testified that Sands called him and informed him of their appointment to meet Mrs. Berger at the paper mill and that he dispatched Deputy Graham to the scene.

Deputy Graham testified that he saw Sands, appellant and Mrs. Berger talking together at the paper mill and that appellant kissed Mrs. Berger upon his departure.

The appellant did not testify in his own behalf but called one Knight who testified that Berger had a policy of insurance with his firm but that it was not a life insurance policy.

He also called Maudell Berger's sister who testified that Maudell and Walter were living together as man and wife at the time of the trial.

F. M. Tindall, testifying for the appellant, stated that prior to the first of the year appellant contacted him about securing a job in Texas and that he sent word to appellant to report to a Mr. Hughes in Texas City for work.

Hughes testified that appellant came to Texas City on the first Monday in January of last year seeking employment but that he had no work for him.

The state proved in rebutttal that there was no central office from which it might be determined which of the 500 insurance companies in Texas carried life insurance on any particular person.

We shall discuss the contentions so ably advanced by appellant's counsel in brief and argument. He first contends that the record fails to establish that the conspiracy charged in the indictment was either entered into or agreed to be executed in Harris County as required by Art. 205, V.A.C.C.P. It is his position that the conspiracy between appellant and Mrs. Berger had been entered into prior to appellant's first contact with Sands in Louisana and that the state failed to prove that the agreement between them was made in Harris County. He further contends that since the shack in Brazoria County where the parties originally planned to kill Berger was not in Harris County, venue in Harris County had not been shown. An issue was made during the trial as to the proof of venue and the matter is thus properly here for decision. In connection with his first contention he states that the meeting at the paper mill could not constitute an entry into a conspiracy under the holding of this court in King v. State, 86 Tex. Cr. Rep. 407, 216 S.W. 1091. We do not agree and shall point out our reasons. In King the prosecution was instituted in Baylor County and it therefore became incumbent upon the state under Art. 205, supra, to prove that the conspiracy was either entered into or was to be executed in Baylor County. The conversation overheard by the boy occurred in Cooke County and in order to confer jurisdiction on Baylor County some place in that county would have to have been mentioned as the place of execution. No such evidence was in the record. The court held further that the trial court was in error in assuming in his charge that venue lay in Baylor County by virtue of the fact that the parties later assaulted the intended victim in Baylor County because the same parties had been acquitted of such assault on the grounds of self defense.

We return to the case at bar. We quote from Sands' testimony concerning the meeting at the paper mill:

"Q. Do you know Mrs. Berger when you see her? A. Yes sir.

"Q. Is she in the court room now? A. Yes sir.

"Q. Where is she? A. She's in the fourth row, in the gray suit with the white patch of hair on the top of her head.

"Q. What was said about the insurance money. Repeat what was said. A. Siess Westbrook said 'Sands is not sure of getting his money or about you.'

"Q. And what did Mrs. Berger say? A. Mrs. Berger said, 'As long as you don't bungle the job you will get your money, but if you bungle the job and the insurance doesn't pay off neither one will get your money.' I said, 'In case the insurance does pay off and you don't give me my money you will be the next to have an accident' and they laughed and assured me I would.

"Q. What did Mrs. Berger and this defendant Westbrook do at that time, if anything? A. She said she had to go to work. I believe they kissed again. She put her arms around him, and they kissed, and she had to go to work. She got out of the car, and she went to the time office, and we left.

"Q. You and Westbrook, this defendant? A. Yes sir.

"Q. Where did you proceed to when you left? A. To Walter Berger's home."

This we hold to be a sufficient showing that the parties charged in the indictment then and there made a positive agreement to kill Berger and that one of them left the scene with Sands for the purpose of executing the agreement. It is immaterial how many times the appellant and Mrs. Berger may have discussed killing her husband or where such conversations may have occurred if the state is able to prove, as they did here, that one such agreement was entered into in Harris County. We add in passing that Pasadena where appellant expected, after the change of plans, to kill Berger is also in Harris County.

Appellant further contends that the court erred in permitting Sands to testify that he originally met appellant while doing undercover narcotics work and that he told appellant that he had been recommended by a friend. No evidence was adduced to show that the appellant in fact had any connection with narcotics. At most this was a showing of how Sands approached those with whom he dealt in the course of his work.

He next complains of that portion of the witness Elder's testimony in which he recounted when and where he had first met appellant. His answer that such meeting had occurred in jail in Angleton was withdrawn from the jury's consideration and we find no reversible error reflected by this bill.

He next contends that Sands was an accomplice as a matter of law and that there was not sufficient evidence to corroborate him. We have discussed the facts rather fully with this contention in mind. It must be remembered that the court instructed the jury that the "testimony of Eddie Oliver, O. E. Henson, Bob Elder, J. D. Walters and Juanita Malone, as to reports made to them by Walter Sands, and testimony as to instructions given by said witnesses to the said Walter Sands concerning the alleged charge of Conspiracy; you are instructed that such evidence was admitted to aid you in determining whether the said Walter Sands is an accomplice, as that term is hereinabove defined, if same does so aid you, and you will not consider same for any other purpose." We have concluded that this record, as set out above, amply supports a jury verdict that Sands was not an accomplice, in which event his testimony did not need to be corroborated.

To recapitulate, Sands by his reports to the officers, which were affirmed by them, established that he was not a co-conspirator, not a principal to the crime of conspiracy, and therefore not an accomplice witness. Once this fact was established, then his testimony, standing alone, as to the conversation between Mrs. Berger and appellant at the paper mill, quoted above, was sufficient to support the conviction.

Appellant's final complaint grew out of the tender by the state to appellant of a defense witness Daw. Immediately after the tender, the jury was withdrawn and there is a complete absence of any showing that the jury was informed that a motion for continuance had been filed or that Daw was named as a witness therein.

Finding the evidence sufficient to support the conviction and no reversible error appearing, the judgment is affirmed.

DAVIDSON, Judge (dissenting)

The trial court instructed the jury that they could not consider the reports and conversations the witness Sands had with

the witnesses Eddie Oliver, O. E. Henson, Bob Elder, J. D. Walters, and Juanita Malone in determining the guilt of the appellant.

Here is the instructions the trial court gave:

"There has been admitted in evidence testimony of Eddie Oliver, O. E. Henson, Bob Elder, J. D. Walters and Juanita Malone, as to reports made to them by Walter Sands, and testimony as to instructions given by said witnesses to the said Walter Sands concerning the alleged charge of Conspiracy; you are instructed that such evidence was admitted to aid you in determining whether the said Walter Sands is an accomplice, as that term is hereinbefore defined, if same does so aid you, and you will not consider same for any other purpose."

The testimony referred to could not be considered by the jury nor by this court upon the question of the guilt of the appellant.

Whether Sands was or was not an accomplice is wholly immaterial, because his testimony — unassociated and unconnected with his reports, conversations, and agreements with the witnesses named—did not make a case against the appellant or show the substantive crime of conspiracy to commit murder.

Sands never agreed to go into any agreement with Maudell Berger. His entire connection with the matter was to prevent the murder and, as an undercover agent, to entrap the parties into a violation of the law.

Under such circumstances, Sands was not and could not be a co-conspirator with the parties to the alleged conspiracy.

On the other hand, if Sands was an undercover agent engaged in entrapping the parties he was violating no law and could not therefore be an accomplice.

All these facts, however, are subordinated to the fact that the acts and declarations of any of the alleged co-conspirators, made out of the presence of each other, were inadmissible because the existence of the conspiracy was never shown.

The state's case, under the charge of the court, rests alone

upon the testimony of the witness Sands to show—and which did not show—the existence of the conspiracy, as alleged.

I dissent.